FILED

04/17/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 9, 2019 Session

**STATE OF TENNESSEE v. SHANE TODD**

**Appeal from the Circuit Court for Gibson County
No. 19425, 19450    Clayburn Peeples, Judge**

_____

**No. W2018-00215-CCA-R3-CD**

_____

After a consolidated jury trial, the defendant, Shane Todd, was convicted of three counts of rape of a child and two counts of solicitation of a minor in case numbers 19425 and 19450.  Tenn. Code Ann. §§ 39-13-522, -528.  On appeal, the defendant argues the trial court erred in denying his motion for a new trial, claiming the jury was exposed to improper outside influence.  The defendant also contends the evidence was insufficient to support his convictions and the trial court's sentencing determinations resulted in an excessive forty-year sentence.  Upon our review, we affirm the judgments of the trial court but note, in sentencing the defendant in case number 19450, the trial court interchanged the sentence terms on the judgment forms for counts one and two as ordered at the sentencing hearing.  Therefore, we remand the case to the trial court for the entry of amended judgment forms as to counts one and two in case number 19450.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and CAMILLE R. MCMULLEN, J., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Shane Todd.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Garry G. Brown, District Attorney General; and Jason Scott and Hillary Parham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

Between January 15, 2015 and March 18, 2016, the defendant committed multiple sexual crimes against his two, minor step-daughters, N.H. and E.M.[1] A Gibson County grand jury indicted the defendant separately for his crimes against each victim. In case number 19425, the defendant was charged with three counts of rape of a child for his crimes against N.H. For his crimes against E.M. in case number 19450, the defendant was charged with two counts of solicitation of a minor, including solicitation for rape of a child (count 1) and solicitation for aggravated sexual battery (count 2). The trial court consolidated the cases and the defendant proceeded to trial on May 15, 2017.

The allegations against the defendant arose in March 2016. At the time, the victims lived in Gibson County, Tennessee with their mother, the defendant, and their younger brother, B.H. The victims, however, spent a lot of time with E.M.'s grandmother, Rhonda Ramey. Ms. Ramey watched the victims after school and E.M. routinely spent the weekends with her. At nearly midnight on March 13, 2016, E.M. disclosed a secret to Ms. Ramey. E.M. stated the defendant locked her in the bathroom and "showed her his private" and "tried to get her to do certain things to him . . . [l]ike hold his penis and stuff." Ms. Ramey immediately called the victims' mother, but she did not respond until the following morning. E.M. then relayed the allegations directly to her mother.

Specifically, E.M. stated the defendant "asked her to crawl in the bed" with him and "proceeded to talk to her about some adult things like the pop rocks next to the bed." The defendant told E.M. the pop rocks were not candy and when E.M. questioned him, the defendant responded: "No. They are not candy. Do you know what you do with pop rocks? I can show you, . . . You sprinkle it on a man's private area and you suck it off." E.M. stated she became frightened and ran to the bathroom. The defendant "chased" E.M. into the bathroom and blocked her from leaving. E.M. threatened to tell her mother, and the defendant threatened that if she did, E.M. would have to live with her father in Indiana.

The victims' mother was "dumbfounded" as she listened to E.M.'s story after which she went home and confronted the defendant. The defendant cried as he denied E.M.'s allegations, and the victims' mother called the police. Officer Steve Webb of the Dyer Police Department responded to the call. Upon arrival, Officer Webb learned the defendant "had been talking to [E.M.] inappropriately about sexual natured stuff and had tried to get [E.M.] to touch his penis." After confronting the defendant with the allegations, the defendant stated, "I would never do this." Officer Webb recalled the defendant "was not real upset," he advised the defendant leave the home, and the

---

[1]It is the policy of this Court to refer to the minor victims by initials only.

defendant complied.  At trial, the victims' mother admitted she continued to speak with the defendant after the abuse allegations emerged.  She stated that she and the defendant kept pop rocks by the bed, but she never explained to the victims how to use pop rocks sexually and denied being overtly sexual with the defendant in front of her children.  At the time E.M. made allegations against the defendant, her mother did not know the defendant had also abused N.H.

However, N.H. soon disclosed separate allegations of abuse against the defendant to her mother.  N.H. was upset, asked for help, and told her mother, "pickle, there, pickle, here."[2]  In response, the victims' mother admitted she did not ask N.H. any questions about the abuse and sent her to school at Dyer Elementary the following day.  While at school on March 15, 2016, N.H. disclosed the defendant's abuse to a school counselor, Alisha Ladd.  At trial, Ms. Ladd detailed the abuse as described by N.H., stating:  "[The defendant] put his private in my mouth and in my butt and I think he peed in my mouth because stuff ran out and it tasted terrible and I can still taste it when I think about it and when I wipe my butt there's blood and I'm scared of [the defendant]."  N.H. stated the defendant abused her while her mother was at work.  Ms. Ladd called the Department of Children's Services ("DCS") and filed an official report.

While investigating the allegations against the defendant, Officer Webb visited Dyer Elementary twice.  During his first visit, he and a DCS worker spoke with E.M and she disclosed the same allegations against the defendant as detailed above.  When N.H.'s allegations emerged, Officer Webb returned to Dyer Elementary to speak with Ms. Ladd and he learned N.H. alleged the defendant "had done things with her of a sexual nature as well."  Officer Webb filed a police report and referred the victims' cases to DCS.  Additionally, on March 18, 2016, Officer Webb interviewed the defendant.[3]  During the interview, the defendant denied the victims' allegations, stating "the only thing that he could think of was that he had used the restroom in the home with the door open while the children were there."

Sydni Turner conducted forensic interviews of the victims on March 18, 2016, by questioning the victims in a "non-suggestive," "narrative format."  During her interview, E.M. wrote "sex" on a sheet of paper and stated she was not allowed to say the word.  N.H. used anatomically correct drawings and free-hand drawings to explain the abuse she experienced by the defendant.[4]  As described by Ms. Turner at trial, in the drawings, N.H. identified the defendant's penis as the "boy private" and/or "pickle" and her vagina as

---

[2]Ms. Hurst testified the victims referred to male private parts as "pickle."
[3]Prior to the interview, the defendant waived his *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).
[4]Four drawings were entered into evidence, however, none of the trial exhibits were made a part of the record on appeal.

"nu-nu." She revealed the defendant kissed her on the mouth and neck, touched her vagina and "butt," and used some form of lubrication on her with an "S" in its name. A DCS employee asked the victims' mother what kind of lubricant she and the defendant used during sex, but she stated they did not use any. The victims' mother later searched her bedroom to determine what N.H. might be referring to and, in doing so, found a jar of Vaseline underneath the table next to the bed.

Because N.H. disclosed she had been penetrated by the defendant, she also underwent a physical examination on April 4, 2016, with Dr. Lisa Piercey, an expert in child abuse pediatrics. N.H. was six years old at the time of the exam. Before conducting the exam, Dr. Piercey obtained N.H.'s medical history from N.H. and her mother which was unremarkable. At trial, however, the victims' mother acknowledged N.H. suffered from urinary tract infections which she originally believed resulted from an allergic reaction to oranges.

During the exam, N.H. told Dr. Piercey, "[the defendant] stuck his pickle in my front, in my mouth and in my butt." Dr. Piercey testified N.H. "spontaneously" continued, stating, "He did it a bunch of times. He did it in the bathroom, in his and mama's room[,] and in my room." Further, Dr. Piercey relayed the following disclosure from N.H.:

> [W]hen [the defendant] put his pickle inside me hard it hurt me bad on my front pickle and there was blood coming out of me on the toilet paper when I wiped, . . . when [the defendant] would put his pickle in my mouth some stuff, I think it was pee, came out of his pickle, but I spit it out, . . . [The defendant] kissed me on the mouth and put his tongue inside my pickle.

Dr. Piercey also questioned the victims' mother who described the sexual abuse in the same way. She denied other forms of abuse and admitted she previously "brushed off" N.H.'s complaints of vaginal burning "as a yeast infection or maybe she was drinking too much juice." The victims' mother began crying and said, "[o]bviously, this is what was going on and I was missing it."

Dr. Piercey detailed the findings of N.H.'s physical exam at trial, noting N.H.'s vaginal/hymenal exam was normal, "but her anal exam was not." Dr. Piercey explained N.H. had two anal tags, or extra tissues, "at the 11 o'clock and 1 o'clock spots on her anus." According to Dr. Piercey, "extra tissue is not a normal finding," but "[i]t doesn't always mean that it's scar tissue from a major injury, but it means something has happened there." Dr. Piercey noted anal tags, especially two, are "quite unusual" to find in a young child. She agreed the anal tags were consistent with someone having anal sex

with a child and noted the fact that N.H. had a normal vaginal exam did not mean she had not had vaginal intercourse. Dr. Piercey opined the blood N.H. noticed when using the restroom "[m]ost likely" resulted from some sort of injury but noted, "[o]nly the injuries that are very significant and very traumatic leave long-term scars" in the vaginal area. As such, Dr. Piercey opined:

> My diagnosis was [] child sexual abuse. I further opined that the finding of no acute or residual vaginal trauma is to be expected given the child's description of the events and length of time since the last episode. The finding of two anal tags is non[-]specific but can be seen after healed anal trauma.

Dr. Piercey recommended a safety plan, long-term counseling, and ordered STD testing for N.H. Dr. Piercey did not perform a rape kit test as the applicable 72-hour timeframe within which to complete one had passed. A copy of Dr. Piercey's report was entered into evidence.[5]

During cross-examination, Dr. Piercey stated N.H. indicated the abuse happened multiple times, but noted, "[t]here's no way to tell based on [a] physical exam alone." She also explained she did not take pictures during N.H.'s physical exam because "[t]here were no definitive findings," "there was nothing to take pictures of," the anal tags were "non-specific," and pictures were unnecessary to her diagnosis. Dr. Piercey noted anal tags could result from "healed trauma from large, hard bowel movements. It could be deflated hemorrhoids. It could just be normal variation in the child's body." Dr. Piercey again explained the non-specific anal tags found were "unusual," noting "the overwhelming majority of the time even in witnessed sexual intercourse there's not any physical exam findings."

Both E.M. and N.H. testified at trail. E.M., born on March 20, 2007, stated she was ten years old and lived in Indiana with her biological father, her step-mother, and her six siblings. Previously, she lived in Tennessee with her mother, the defendant, N.H., and B.H. E.M. then detailed the defendant's abuse which began in his bedroom. Before taking a nap one day, E.M. went to the defendant's bedroom to hug the defendant as he lay in bed. As she started to leave the bedroom, the defendant told her to "come back." E.M. saw pop rocks on the table by the bed and asked for some. The defendant "explained to [her] what they were for" and "started talking about this inappropriate stuff." When asked for more detail about the "inappropriate stuff," E.M. stated she was not supposed to say the word and instead wrote "sex" on a sheet of paper at trial.

---

[5]Again, we note the trial exhibits were not made a part of the record on appeal.

E.M. continued, however, and stated while she was still in the bedroom, the defendant "started telling [her] what [sex] feels like and stuff and he kept telling [her] to pull down [her] shorts." E.M. refused and the defendant "said it was only gonna take a couple of minutes because" her mother was "still at work." E.M. believed the defendant said it would take "like 15 minutes." She kept trying to leave the bedroom, but the defendant kept telling her to pull down her shorts. E.M. again refused and stated, "I have to go to the bathroom." The defendant, however, followed her into the bathroom, "pulled down his pants[,] and he kept on telling [her] to touch his private and [she] kept on telling him no." The defendant threatened, "If you don't touch it you're not gonna come out" of the bathroom. E.M. continued to refuse the defendant, told him to "pull up [his] pants" and to "go away," and stated she would tell her mother. The defendant let E.M. out of the bathroom, pulled up his pants, went into the kitchen, and washed his hands. He asked E.M., "Are you really gonna tell your mom?" E.M. told him "No, that it was an excuse to get out" of the bathroom. The defendant nodded his head, and E.M. went to the living room.

The defendant told E.M. she could end up in foster care if she told her mother about his actions because her parents were in the middle of a custody dispute at the time. E.M. feared she would not be able to live with her mother if she told anyone what the defendant did to her. However, E.M. later told her grandmother about the defendant's actions. During cross-examination, E.M. stated she spoke with her mother, her father, a counselor, and the prosecutor about her trial testimony. She knew to be respectful and to tell the truth. She admitted her friends from school once looked up "inappropriate stuff" on her cell phone. The victims' mother detailed the cell phone incident further at trail, stating she found pornography on E.M.'s cell phone. As punishment, the defendant wanted to take E.M.'s cell phone away from her and to preclude her from going to her grandmother's home on the weekends. Additionally, the victims' mother testified E.M. previously alleged physical abuse against her step-mother in Indiana but denied E.M. made the allegations against her step-mother in an attempt to get her mother and her biological father back together.

N.H. also testified at trial. She stated she was eight years old and born on May 18, 2009. N.H. described an instance of abuse that occurred while the defendant watched her when she was home sick from school. N.H. stated the defendant "put his private in [her] mouth and [] think[s] he peed in that because [she] felt something watery next to [E.M.'s] bed and [she] spit it out." N.H. stated before the defendant put his penis in her mouth, the defendant put his "private" in her "private" for one or two minutes. After the incident, N.H. stated she felt "sad," but the defendant made "[l]ike a happy face" to her and smiled. After which, N.H. "just looked at the TV."

N.H. stated the defendant abused her "[a] lot," noting it happened "in my mamma and his room and then he done it in the living room with my brother in there. He just put like a cover around us." N.H. explained while she and B.H. were in the living room with the defendant, the defendant "put a blanket over" them, pulled her pants down, "put his private in [hers]," and put his private "in [her] bottom, too," approximately three times. N.H. stated the defendant's actions again made her feel "sad." The defendant then got up and went to his bedroom where he again put his penis in N.H.'s "bottom" and vagina. She described a substance the defendant put in her vagina that came from a "box that had a blue top." The defendant "put his finger in the tub and then he just wiped it in [N.H.'s] private." N.H. felt "[k]ind of like sad" after the defendant's actions. N.H. identified "the stuff [the defendant] put in [her] private" as Vaseline.

N.H. described another instance where the defendant told her to take a shower, but there were clothes in the bathtub. The defendant entered the bathroom and "laid a towel down." He told N.H. to get out of the bathtub and lie down on the towel. The defendant asked N.H., "Do you want to do it now or later." N.H. did not "want to do it" so she told the defendant, "[l]ater." The defendant, however, "just did it anyways." Specifically, the defendant "put his private in [N.H.'s] private."

N.H. also described a time when the defendant "rubbed on [her] private" while in the bathroom. She explained the defendant "put [her] in the door" which hurt her back. In addition to the instances of abuse previously described, N.H. stated the defendant penetrated her multiple times.

During her testimony, N.H. reviewed the pictures she drew during her forensic interview and identified on separate pictures the areas of the body she referred to as "private," mouth, and "bottom." N.H. identified a picture she drew of the defendant, pointing out the defendant's hair, neck, arms, legs, foot, "private," and hair on his legs and private area. N.H. stated she had heard the term "shaking" before and described it as something "two grownups . . . do . . . but kids don't." She stated the defendant "[k]ind of" shook when he penetrated her. Further, N.H. stated once the defendant was shaking on her "private and it hurt [her] legs" making her cry.

Before resting its case, the State made an election of offenses as to the crimes alleged against E.M. In count one, the State argued the defendant solicited E.M. for rape by telling E.M. what sex feels like and explaining how to use pop rocks sexually. In count two, the State argued the defendant solicited E.M. for aggravated sexual battery by following her into the bathroom, exposing himself, and asking her to touch his penis.

The defendant put forth several witnesses in his defense and also testified at trial. Roger Fowler, a friend of the defendant and the victims' mother, stated he did not see the

defendant interact with the victims but heard their mother discuss details of her sex life in front of her children. He also testified their mother "played court" with the victims in order "to keep them from crying when they [got] on the witness stand."

The defendant's neighbor, Desiree McDaniel, recalled a day she picked the victims up from school. In relation to the allegations made against the defendant, Ms. McDaniel overheard N.H. tell E.M., "I told them what you told me to say." E.M. responded, "Shut up." Ms. McDaniel also overheard N.H. blame E.M. as the reason why the defendant left their home. Ms. McDaniel believed the defendant maintained a good relationship with the victims, noting the defendant pushed them off "every time the girls would get near him."

The defendant's sister, Evelyn Marshall, echoed Ms. McDaniel's testimony by explaining the defendant was raised that girls do not sit in their father's lap. Ms. Marshall also agreed the victims' mother was overtly sexual with the defendant in front of her children. She remembered E.M. looking up pornography on her cell phone and recalled a situation involving E.M.'s credibility after E.M. alleged her step-mother abused her. E.M. later recanted the allegations against her step-mother and when her mother learned E.M. lied, she stated they could not change their story regarding the abuse because they were "too far" into a custody dispute with E.M.'s father. Ms. Marshall testified the defendant was upset by the victims' mother's decision not to tell the truth regarding the same. Ms. Marshall also stated the victims' mother was not as loving towards N.H. compared to her other children and testified the defendant "would never do anything to hurt a child."

D.T., the defendant's fourteen-year-old niece, also testified on the defendant's behalf. She stated the defendant was caring towards the victims despite E.M. telling lies about him. For example, D.T. stated E.M. "said that [the defendant] had pushed her one time and he did not." D.T. explained E.M. did not like her step-mother and E.M. falsely accused her step-mother of abuse. D.T. testified "the only reason that [E.M.] said it was because she wanted her mother and her real father back together." D.T. stated E.M. "lied a lot," "let a girl look up porn on her phone," and "treated [N.H.] very poorly." D.T. witnessed E.M. showing N.H. "how you have sex" with dolls, noting they used the term "shaking" for sex. D.T. also stated the victims' mother was sexual with the defendant in front of her children and the defendant did not allow the victims to sit in his lap.

The defendant then testified. He stated he "believe[d]" he married the victims' mother on June 30, 2014. The defendant stated he "interacted with [his step-children] like any father would," but he did not let the girls sit in his lap because "it just don't look right for a daughter to sit on her father's lap." The defendant explained he had an "open" sex life with the victims' mother, noting she was sometimes sexual with him in front of

the children which made him uncomfortable and she talked about sex in front of the children "quite a bit." The defendant also claimed the victims' mother was not as loving towards N.H. compared to E.M. and noted E.M. and her grandmother had "a really strong relationship."

The defendant denied sexually abusing E.M. and N.H., stating he felt hurt, "mad," and "angry" as a result of the allegations. He detailed the sequence of events on the day he learned of E.M.'s allegations. When he woke up, their mother was upset and told him, "[E.M.] just said that you tried to mess with her." The defendant told her to "call the cops and get them over here right now." When Officer Webb arrived, the defendant asked him, "what do I need to do to protect myself with these allegations" and Officer Webb told him to "leave the premises." The defendant complied, but continued seeing the victims' mother even though he did not return to the home. According to the defendant, the victims' mother told him not to worry about the allegations, E.M. "has lied before," and "I love you and we'll work through this." N.H.'s allegations then emerged. The defendant denied the same and stated: "I loved them kids like they were mine and, pardon my words, but I'm not no pervert. By far I'm probably the furtherest away from that."

The defendant also attacked E.M.'s credibility at trial, believing she falsely accused him of sexual abuse in an effort to reunite her parents or in order to live with her grandmother. Further, the defendant stated E.M. once looked up pornography on her cell phone. As punishment, he threatened to ban E.M. from visiting her grandmother on the weekend, and as a result, she blamed the pornography on her friends. The defendant, however, did not believe her. The defendant also detailed a separate incident of alleged abuse involving E.M. and her step-mother. The defendant explained E.M. accused her step-mother of physical abuse in an effort to spend more time with her grandmother. When the defendant and the victims' mother learned E.M. lied about the abuse, the defendant stated they needed to call E.M.'s father and "tell them what's going on." Her mother disagreed, stating "if we tell them right now we can possibly go to jail" and "we're too far" into the custody dispute.

Regarding N.H., the defendant testified he often told the victims' mother to spend more time with N.H. as E.M. got most of her attention. The defendant then discussed a video recorded on his phone on March 13, 2016, the day E.M. alleged abuse against him. According to the defendant, he and E.M. shot nerf gun arrows at each other that day. At the time, E.M. "was laughing, playing, [and] cutting up." Later, however, the defendant learned E.M. was upset by the activity and he recorded a video on his phone where he and N.H. discussed the incident. The video was played for the jury.[6] During cross-

---

[6]As noted above, the video was not made available to this Court on appeal.

examination, the defendant stated he had not seen the video of N.H. on his phone prior to trial, did not remember recording the video, and did not know the video was recorded the same day E.M. alleged he abused her.

The defendant admitted he picked up N.H. early from school one day when she was sick and acknowledged two acts of physical abuse he committed against the victims' mother. Specifically, the defendant pushed her while in the car and chipped her tooth. Separately, the defendant pushed and slapped her while in the living room of their home. The defendant admitted to using pop rocks with the victims' mother during oral sex. He also stated E.M.'s grandmother never filed for custody of E.M. Instead, she provided financial support during the custody battles.

In rebuttal, the State offered testimony from E.M.'s biological father, who explained he did not believe E.M. lied about allegations of physical abuse against her step-mother. Rather, he explained E.M.'s step-mother was trying to demonstrate to E.M. what could happen if she slammed a door. In doing so, E.M.'s step-mother placed her hand at the top of the car door, placed E.M.'s hand in the door, and pulled the door closed "to show where it would hit where it could potentially break her fingers if done hard enough." E.M.'s father stated, "yes, [E.M.'s] hands did get into the door, but [they weren't] slammed in the door." He also stated E.M. did not realize her step-mother was demonstrating what could happen if E.M. slammed a door and as such, he did not think E.M. lied about the allegations. Regardless, E.M.'s father denied any abuse on behalf of E.M.'s step-mother. The victims' mother and E.M.'s grandmother also testified in rebuttal. Their mother stated she does not favor one child over another, but acknowledged they each have different personalities. E.M.'s grandmother stated E.M. lived with her at one time and as such, E.M. has a bedroom at her home. At the close of the proof, the jury convicted the defendant as charged, and he received an effective forty-year sentence.

The defendant filed a motion for new trial. At the hearing on the same, the defendant argued the evidence was insufficient to support his convictions, the trial court erred in imposing his sentence, and the jury was improperly sequestered. The defendant presented testimony from defense investigator, Steve Holt, who attended the entirety of the defendant's trial. Mr. Holt observed the jury "mingling with witnesses in the hallway," but "didn't hear specific conversations" between them. He saw the victims sitting "[i]mmediately outside the courtroom for most of the trial" and believed the jury must have seen the victims upon exiting the courtroom as "[y]ou couldn't miss them when you walked out the door." The defendant offered no additional proof. The trial court denied the motion for a new trial, and this timely appeal followed.

*Analysis*

I.      *Sufficiency of the Evidence*

On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of

fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

### a. Rape of a Child

The jury convicted the defendant of three counts of rape of a child for his crimes against N.H. Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501 (7). The defendant generally asserts the evidence is insufficient to support his convictions for rape of a child, arguing reasonable doubt exists as to whether penetration occurred based upon the "normal" and "non-specific" findings of N.H.'s physical examination. The State argues sufficient evidence exists to sustain the defendant's convictions as N.H testified to multiple acts of penetration which were corroborated throughout the trial, and we agree.

At trial, N.H. testified the defendant penetrated her mouth, vagina, and anus in the living room, bathroom, and bedrooms of their home. The first description of abuse occurred while N.H. was home sick from school. That day, the defendant penetrated N.H.'s vagina with his penis for a couple of minutes before putting his penis in her mouth. After the defendant penetrated her mouth, N.H. thought he "peed" and "spit it out." The defendant admitted to picking N.H. up early from school when she was sick. A second description of abuse occurred while N.H., the defendant, and B.H. were in the living room. N.H. stated the defendant covered their bodies with a blanket, pulled her pants down, and penetrated her vagina and anus. They moved to the bedroom where the defendant wiped Vaseline on her vagina and again penetrated her vagina and anus. A third instance of abuse occurred in the bathroom. N.H. explained the defendant penetrated her vagina after telling her to take a shower. N.H. also testified the defendant "rubbed on [her] private" and "[k]ind of" shook while penetrating her.

N.H. disclosed the abuse to her mother, Ms. Ladd, Ms. Turner, and Dr. Piercey. Referring to the defendant's penis, N.H. told her mother the defendant put his "pickle, there, pickle, here." N.H. told Ms. Ladd the defendant "put his private in her mouth and butt" and "peed in [her] mouth," noting it "tasted terrible." During her forensic interview with Ms. Turner, N.H. specified with pictures where the defendant abused her, identifying the defendant kissed her mouth and neck and touched her vagina and anus. N.H. testified the defendant "wiped" Vaseline on her vagina. The victim's mother stated she found Vaseline by her bed and denied personal use of the same. N.H. told Dr. Piercey the defendant penetrated her mouth and vagina with his tongue and penis "a bunch of times" in her bedroom, his bedroom, and the bathroom. N.H. also told Dr. Piercey she thought the defendant peed in her mouth, but she "spit it out." N.H. told both Ms. Ladd and Dr. Piercey she bled after the defendant penetrated her. After conducting a physical exam, Dr. Piercey testified N.H. had a normal vaginal exam but that did not mean she had not had vaginal intercourse as only "very significant and very traumatic" injuries leave scars. Despite the normal vaginal exam, Dr. Piercey noted two anal tags which were "quite unusual" and were consistent with anal penetration. Dr. Piercey diagnosed N.H. as a victim of "child sexual abuse." The defendant denied raping N.H. at trial. Upon our review of the record, however, it is apparent the jury weighed the defendant's denial against the vast amount of evidence produced against him at trial, and found in favor of the State. This Court will not reweigh the evidence. *Dorantes*, 331 S.W.3d at 379. Accordingly, sufficient evidence exists to show the defendant committed three counts of rape of a child against N.H., and the defendant is not entitled to relief.

### b. *Solicitation of a Minor for Rape of a Child and Aggravated Sexual Battery*

The jury convicted the defendant of two counts of solicitation of a minor. In count one, the defendant was found guilty of soliciting E.M. for rape of a child. In count two, the defendant was found guilty of soliciting E.M. for aggravated sexual battery. At the end of trial, the State elected the specific facts upon which it relied for each conviction. The State alleged the defendant solicited rape of a child by telling E.M. what sex feels like and detailing how to use pop rocks sexually (count one). The State argued the defendant solicited aggravated sexual battery by exposing himself to E.M. and asking her to touch his penis while confining her to the bathroom (count two). The defendant contends insufficient evidence exists to support these convictions by arguing they rest solely on the testimony of E.M., a witness with "questionable credibility," absent any physical evidence to support the same. The State suggests E.M.'s trial testimony alone was sufficient to support the defendant's convictions, noting further her testimony was corroborated throughout the trial. Upon our review, we agree with the State.

- 13 -

Here, the defendant was charged with two counts of solicitation of a minor pursuant to Tennessee Code Annotated section 39-13-528, which states:

(a) It is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age, or solicits a law enforcement officer posing as a minor, and whom the person making the solicitation reasonably believes to be less than eighteen (18) years of age, to engage in conduct that, if completed, would constitute a violation by the soliciting adult of one (1) or more of the following offenses:

(1) Rape of a child, pursuant to § 39-13-522;

. . .

(4) Aggravated sexual battery, pursuant to § 39-13-504.

Tenn. Code Ann. § 39-13-528 (a)(1), (4). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" and "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504 (a)(4). Sexual contact "includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501 (6). In resolving this issue, we also rely on the definition of rape of a child and sexual penetration as noted previously in this opinion.

At trial, E.M. detailed the defendant's actions which supported his convictions for solicitation of a minor for rape of a child (count one) and aggravated sexual battery (count two). As charged in count one, E.M. explained while in the defendant's bedroom, he told E.M. what sex felt like, asked her to pull down her shorts, and explained how to use the pop rocks that E.M. saw next to the bed for oral sex. The defendant implied the sex would only last "a couple of minutes" while her mother was "still at work." At trial, both the defendant and the victim's mother admitted to using pop rocks during oral sex, but the victim's mother denied explaining their use to E.M. Regarding count two, E.M. testified she exited the bedroom and entered the bathroom in order to avoid the defendant's demands. The defendant, however, followed her into the bathroom where he

- 14 -

exposed his penis and told E.M. to touch the same. The defendant threatened to restrain E.M. in the bathroom until she touched his penis. The defendant then threatened that E.M. would be placed in foster care if she told anyone about his actions.

The record reveals E.M. described the defendant's actions in the same way to her grandmother, her mother, and Officer Webb. During her forensic interview, E.M. wrote "sex" on a sheet of paper when asked about the defendant's abuse. Though the defendant denied all of E.M.'s allegations and attacked her credibility at trial, the jury was not persuaded as evidenced by their verdicts and this Court will not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. Accordingly, sufficient evidence exists to show the defendant solicited E.M. for rape of a child and aggravated sexual battery. The defendant is not entitled to relief.

## II.  *Alleged Jury Tampering*

The defendant argues the trial court erred in denying his motion for new trial after "being made aware of issues regarding potential juror contact with the minor victims." The defendant claims "[t]he jurors were exposed to general conversation about the trial and contact with the minor victims as the jurors would exit the courtroom on breaks during the trial and deliberations." The defendant admits "there is no testimony that jurors conversed with any third party," but further claims "they were exposed to conversations about the case in the hallway immediately outside the court." The State contends the defendant failed to provide evidence of "any extraneous prejudicial information or improper outside influence" as he has "only presented evidence that the jurors walked through a crowded courthouse hallway, and that the victims might have been seated in that hallway." Upon our review of the record, we agree with the State.

Every criminal defendant enjoys the right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). The validity of a jury verdict will be considered questionable "[w]hen a jury has been subjected to either extraneous prejudicial information or an improper outside influence." *Id.* (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). Extraneous prejudicial information includes "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* (internal citations omitted). Improper outside influence is "any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

The challenging party "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id.* at 651 (citing *Caldararo*, 794 S.W.2d at 740-41). If successful, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). However, "something more than a bare showing of a mingling with the general public is required where the jury is not sequestered to shift the burden of proof to the State of showing no prejudice." *Blackwell*, 664 S.W.2d at 689. A violation of the constitutional right to an impartial jury presents a mixed question of law and fact which this Court reviews de novo, affording a presumption of correctness only to the trial court's findings of fact. *Adams*, 405 S.W.3d at 656 (citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001)).

Here, the defendant has failed to provide sufficient evidence to successfully question the validity of the verdicts rendered against him. Rather, at the motion for new trial hearing, the defendant offered general statements from Mr. Holt, the investigator for the defense, indicating the witnesses, victims, and jurors were in the same hallway throughout the trial. Mr. Holt stated he did not "hear specific conversations" between the jurors and the witnesses, but he did see them "mingling" in the hallway. Additionally, Mr. Holt testified he assumed the witnesses and jurors saw the victims sitting "[i]mmediately outside the courtroom" throughout the trial. The defendant offered no additional proof in support of his validity challenge.

Relying solely on the testimony of Mr. Holt, we determine the defendant has failed to provide evidence the jury received extraneous prejudicial information or was subject to improper outside influence. The record is absent any evidence identifying that a juror was in receipt of outside information not admitted into evidence. *Adams*, 405 S.W.3d at 650. Further, nothing in the record suggests any juror was exposed to "unauthorized private communication, contact, or tampering." *Id.* 651. The mere fact the jurors, witnesses, and victims used the same hallway throughout the trial does not rise to the level necessary to successfully challenge the validity of the jury's verdict in this case. The defendant is not entitled to relief.

### III. Sentencing

Finally, we review the trial court's imposition of an effective forty-year sentence. When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). This Court also reviews consecutive sentences imposed

by the trial court under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W. 3d at 707; *Pollard*, 432 S.W.3d at 859-60. The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In imposing a sentence, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. Tenn. Code Ann. § 40-35-210 (b). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103 (2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. Tenn. Code Ann. § 40-35-210 (e).

After doing so, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210 (d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." Tenn. Code Ann. § 40-35-210 (c); *Carter*, 254 S.W.3d at 346. A non-exclusive list of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. The weighing of both mitigating and enhancement factors is left to the trial court's sound discretion, but a trial court's misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

Further, Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).

Pursuant to statute, consecutive sentencing is permitted when "[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims." Tenn. Code Ann. § 40-35-115 (b)(5).

Here, the defendant contends the trial court improperly applied two enhancement factors and erroneously imposed partial, consecutive sentencing. We disagree as the record shows the trial court complied with the purposes and principles of sentencing before imposing an effective forty-year sentence. In sentencing the defendant, the trial court properly applied three enhancement factors to the defendant's sentences and found the defendant was eligible for consecutive sentencing because he was "convicted of two (2) or more statutory offenses involving sexual abuse of a minor." Tenn. Code Ann. § 40-35-115 (b)(5). The trial court explained:

All right. The [c]ourt finds, first of all, that the [d]efendant is a Range One Standard Offender and that he does not have criminal convictions in addition to those necessary to establish any other range, although the [c]ourt does note at least 12 traffic offenses in the last 10 years.

The [c]ourt finds that Factor Four does apply; that the [d]efendant -- that the victims were particularly vulnerable because of age.

The [c]ourt finds with regard to the rape case, 19425, that Factor Seven applies and it does find with regard to all three cases -- three offenses, that the [d]efendant did abuse a position of private trust, so that being the case, the [c]ourt finds in Case Number 19425 the [d]efendant should be sentenced to 30 years for rape of a child.

For solicitation in Case Number 19450, for solicitation to commit the crime of rape, the [c]ourt feels a sentence of 10 years is appropriate and five years on the sexual battery matter.

. . .

The [c]ourt feels that the number of convictions, the nature of the damage caused by these convictions, the extent of the residue of mental damage to the victims requires that the two (sic) rape of a child cases will be run concurrently. The solicitation cases will be run concurrently with

each other, but consecutively to 19425, so the [d]efendant will serve a 30 year sentence and then a 10 year sentence.

In case number 19425, the defendant was convicted of the Class A felony of rape of a child under Tennessee Code Annotated section 39-13-522, which provides: "Notwithstanding title 40, chapter 35, a person convicted of a violation of this section shall be punished as a Range II offender; however, the sentence imposed upon such person may, if appropriate, be within Range III but in no case shall it be lower than Range II." Tenn. Code Ann. § 39-13-522 (b)(2)(A). Accordingly, as a statutorily-imposed Range II offender, the defendant faced a sentencing range between twenty-five and forty years. Tenn. Code Ann. § 40-35-112 (b)(1). The trial court imposed thirty-year sentences for each of the defendant's three convictions for rape of a child. Because the thirty-year sentences imposed by the trial court fall within the applicable sentencing range for the defendant's offenses they are presumed reasonable by this Court. *Bise*, 380 S.W. 3d at 707; *Caudle*, 388 S.W.3d at 278-79.

In case number 19450, however, the trial court sentenced the defendant as a Range I offender as nothing in the convicting statutes imposed an offender status upon the defendant. Thus, the defendant faced a sentencing range of eight to twelve years for the Class B felony of solicitation of a minor for rape of a child and faced a sentencing range of three to six years for the Class C felony of solicitation of a minor for aggravated sexual battery. Tenn. Code Ann. §§ 39-13-504 (b); 39-13-522 (b)(1); 39-13-528 (c); Tenn. Code Ann. § 40-35-112 (a)(2), (a)(3). As such, the ten-year sentence imposed by the trial court for the Class B felony and the five-year sentence imposed for the Class C felony fall within the applicable sentencing range for the defendant's offenses and are presumed reasonable by this Court. *Bise*, 380 S.W. 3d at 707; *Caudle*, 388 S.W.3d at 278-79.

The trial court applied the abuse of a position of private trust enhancement factor to all of the defendant's convictions, and the defendant does not dispute the trial court's application of the same. Tenn. Code Ann. § 40-35-114 (14). Instead, the defendant argues the trial court improperly enhanced his sentence by relying on the following two enhancement factors:

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability;

[and]

(7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement.

- 19 -

Tenn. Code Ann. § 40-35-114 (4), (7). We, however, disagree. As evidenced above, in sentencing the defendant, the trial court properly weighed the applicable enhancement factors after the defendant failed to argue any mitigating factors applied. In relation to the applied enhancement factors, the record makes clear the defendant's victims were six and eight at the time of the abuse and the defendant raped N.H. in order to gratify his desire for pleasure or excitement. *Id.* The trial court specifically stated the sexual gratification enhancement factor applied only to the rape of a child convictions in case number 19425. Further, our supreme court has made clear "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, nothing in the record indicates the trial court abused its discretion in enhancing the defendant's sentences above the statutory minimum and the defendant is not entitled to relief as to this issue. *Bise*, 380 S.W.3d at 707.

Finally, as noted above, it is well settled that the trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Here, the trial court found one statutory criterion existed in the record to warrant consecutive sentencing:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

Tenn. Code Ann. § 40-35-115 (b)(5). This criterion is explicit in the record and supports the trial court's consecutive sentencing as to the defendant's convictions.

Specifically, the record shows the defendant was convicted of five sexual crimes against his two, minor step-daughters which occurred over a period of fourteen months and left a "residue of mental damage" upon each victim. The trial court limited the defendant's exposure by grouping the convictions by victim before imposing consecutive sentencing. The trial court ran the sentences for the convictions against N.H. concurrently to one another, totaling an effective thirty-year sentence. The trail court also ran the convictions committed against E.M. concurrently to one another for an effective ten-year sentence. The trial court then imposed consecutive sentencing for the two sentencing groupings for an effective forty-year sentence. The defendant is not

entitled to relief as the record makes clear the trial court did not abuse its discretion in imposing partial, consecutive sentencing for the convicted offenses. Tenn. Code Ann. § 40-35-115 (b)(5).

However, we note, the trial court erred in completing the judgment forms in case number 19450 by inadvertently imposing a sentence of five years for solicitation of a minor for rape of a child and ten years for solicitation of a minor for aggravated sexual battery. Thus, we remand this matter to the trial court for entry of amended judgments reflecting the sentences imposed by the trial court at the sentencing hearing of five years for solicitation of a minor for aggravated sexual battery and ten years for solicitation of a minor for rape of a child.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court, but remand this cause to the trial court for the entry of corrected judgment forms as to counts one and two in case number 19450.

_____
J. ROSS DYER, JUDGE